

**LITTLER MENDELSON**
A Professional Corporation
885 Third Avenue, 16th Floor
New York, NY 10022.4834
Telephone: 212.583.9600

Christina L. Feege, Esq.
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA ROCKMORE,<br><br>                    Plaintiff,<br><br>  -against-<br><br>DARRICK E. ANTELL,<br>DARRICK E. ANTELL, M.D., D.D.S., P.C.,<br>DARRICK E. ANTELL, M.D., D.D.S., P.C., F.A.C.S.<br>DARRICK E. ANTELL, M.D., F.A.C.S. and<br>DARRICK E. ANTELL, M.D., F.A.C.S., P.C.,<br><br>                    Defendants. | Civil Action No.<br><br>**NOTICE OF REMOVAL OF CIVIL ACTION UNDER 28 U.S.C. § 1441(b) (FEDERAL QUESTION)** |

MAY 0 4 2007

U.S.D.C. S.D.N.Y.
CASHIERS

**TO THE CLERK FOR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK:**

**PLEASE TAKE NOTICE** that Defendants DARRICK E. ANTELL, DARRICK E.

ANTELL, M.D., D.D.S., P.C., DARRICK E. ANTELL, M.D., D.D.S., P.C., F.A.C.S.

DARRICK E. ANTELL, M.D., F.A.C.S., and DARRICK E. ANTELL, M.D., F.A.C.S., P.C.,

(collectively referred to as "Defendants") hereby remove the above-entitled action from the

Supreme Court, State of New York, New York County, to the United States District Court for

the Southern District of New York, on the grounds that this Court has original jurisdiction under

28 U.S.C. § 1331 and this action is one that may be removed to this Court by Defendants

pursuant to 28 U.S.C. §§ 1441(b), 1441(c), 1446.

In support of this Notice of Removal of Civil Action, Defendants state:

1.      On or about December 19, 2006, Plaintiff Barbara Rockmore ("Plaintiff") filed a

Complaint in the Supreme Court, State of New York, New York County, against Defendants entitled *Barbara Rockmore, vs. Darrick E. Antell, Darrick E. Antell, M.D., D.D.S., P.C., Darrick E. Antell, M.D., D.D.S., P.C., F.A.C.S. Darrick E. Antell, M.D., F.A.C.S. and Darrick E. Antell, M.D., F.A.C.S., P.C.*, Index No. 06-118789. Plaintiff's Complaint alleged federal and local statutory claims against Defendants which arose out of Plaintiff's employment. These claims were asserted under 42 U.S.C. § 1981 and the Administrative Code of the City of New York, New York City Human Rights Law, § 8-107 *et seq.*

2.    On or about April 10, 2007, Plaintiff served a copy of the Summons and Complaint by hand delivery to Defendants' place of business, and thereafter served a copy of the Summons and Complaint upon the Secretary of State of the State of New York. Defendants attached hereto a true and correct copy of all process served upon in this matter. *See* **Exhibit 1** hereto.

3.    Accordingly, Defendants have filed this Notice of Removal within 30 days after the receipt of the first pleading setting forth a removable claim, and it is timely filed under 28 U.S.C. § 1446(b). Plaintiff's Complaint alleges, *inter alia*, a federal cause of action under the 42 U.S.C. § 1981.

4.    Plaintiff's Complaint also asserts municipal statutory claims asserted under the Administrative Code of the City of New York, New York City Human Rights Law, § 8-107 *et seq.* Where a federal court has subject matter jurisdiction over one or more federal question claims, it shall assert supplemental jurisdiction over any other state claims arising out of the same operative facts. 28 U.S.C. § 1367(a). In the present case, both the state and federal claims derive from a single set of operative facts surrounding Plaintiff's employment. Indeed, by filing a single action, Plaintiff has demonstrated an expectation that all of her claims will be considered in a single lawsuit. Consequently, because Plaintiff's claims arising under local law sufficiently intertwine with his federal claim in a single proceeding, this Court has supplemental jurisdiction over Plaintiff's state law claims.

2

5.    This Court has original jurisdiction under 28 U.S.C. § 1331 and removal jurisdiction under 28 U.S.C. §§1441(b) and 1441(c).

6.    Under 28 U.S.C. § 1441(a), venue of the removed action is proper in the Southern District of New York, which is situated in the same County where the state action is pending.

7.    The Notice to Adverse Parties of Removal to Federal Court was filed in Supreme Court, State of New York, New York County, and served simultaneously herewith in accordance with 28 U.S.C. § 1446(d), and a copy thereof is attached hereto as **Exhibit 2**.

8.    The Notice to State Court of Filing of Notice of Removal was filed in Supreme Court, State of New York, New York County, and served *via* Federal Express herewith in accordance with 28 U.S.C. § 1446(d), and a copy thereof is attached hereto as **Exhibit 3**.

9.    The Defendants' Civil Cover Sheet is attached as **Exhibit 4**.

Dated: New York, New York
       May 4, 2007

Christina L. Feege (CL-1474)
LITTLER MENDELSON
 A Professional Corporation
885 Third Avenue, 16th Floor
New York, New York 10022.4834
Telephone: 212.583.9600
Fax: 212.832.2719

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA ROCKMORE,<br><br>                    Plaintiff,<br><br> -against-<br><br>DARRICK E. ANTELL,<br>DARRICK E. ANTELL, M.D., D.D.S., P.C.,<br>DARRICK E. ANTELL, M.D., D.D.S., P.C., F.A.C.S.<br>DARRICK E. ANTELL, M.D., F.A.C.S. and<br>DARRICK E. ANTELL, M.D., F.A.C.S., P.C.,<br><br>                    Defendants. | Civil Action No.<br><br><br>**CERTIFICATION OF SERVICE**<br>**BY FEDERAL EXPRESS** |

I, **Christina L. Feege** hereby certify that on May 3, 2007, I caused a true and correct copy of Defendants' Notice to State Court of Filing of Notice of Removal, Notice of Removal of Civil Action Under 28 U.S.C. § 1441(b) (Federal Question), and Notice to Adverse Party of Filing of Notice of Removal, to be served *via* Federal Express upon the following:

Scott A. Lucas, Esq.
Law Offices of Scott A. Lucas
Attorney for Plaintiff
The Lincoln Building - Suite 1001
60 East 42nd Street
New York, New York 10165
(212) 573-6906

I declare under penalty of perjury under the laws of the Untied States of America that the forgoing is true and correct.

Executed this 3rd day of May 2007 in New York, New York.

Christina L. Feege (CL-1474)

**EXHIBIT 1**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X

BARBARA ROCKMORE,                                      Index No. 06 - 118789

                     *Plaintiff,*

    -against-

DARRICK E. ANTELL,                                      **SUMMONS**
DARRICK E. ANTELL, M.D., D.D.S., P.C.,                  **WITH NOTICE**
DARRICK E. ANTELL, M.D., D.D.S., P.C., F.A.C.S.,
DARRICK E. ANTELL, M.D., F.A.C.S. and                  **NEW YORK**
DARRICK E. ANTELL, M.D., F.A.C.S., P.C.,               **COUNTY CLERK'S OFFICE**

                     *Defendants.*          **NOT COMPARED**
-------------------------------------------------------------X          **WITH COPY FILED**

TO THE ABOVE-NAMED DEFENDANTS:

      YOU ARE HEREBY SUMMONED to answer the Complaint in this action
and to serve a copy of your answer, or, if the complaint is not served with this
summons, to serve a notice of appearance on Plaintiff's attorneys within 20 days
after the service (or within 30 days after the service is complete if this summons is
not personally delivered to you within the State of New York); and in the case of
your failure to appear or answer, judgment will be taken against you by default for
the relief demanded herein.

      Plaintiffs designate New York County as the place of trial. The basis of
venue is CPLR §§ 503 and 509.

<u>Defendants' Address:</u>                          <u>Plaintiffs' Attorneys:</u>

Darrick E. Antell,                                  Law Offices of Scott A. Lucas
(address presently unknown)                         The Lincoln Building, Suite 1001
                                                    60 East 42nd Street
Darrick E. Antell, M.D., D.D.S., P.C.               New York, NY 10165
Darrick E. Antell, M.D., D.D.S., P.C., F.A.C.S.     (212) 573-6906
Darrick E. Antell, M.D., F.A.C.S. and
Darrick E. Antell, M.D., F.A.C.S., P.C.,
850 Park Avenue
New York, NY 10021
(212) 988-4040

NOTICE: This action is to recover not less than $1,000,000 in compensatory damages and not less than $2,500,000 in punitive damages based on, *inter alia*, Defendants' violations of the New York City Human Rights Law (New York Administrative Code (N.Y. Admin. Code § 8-107) and also 42 U.S.C. § 1981. Upon your failure to appear, judgment will be taken against you by default for the principal sum of not less than $3,500,000, plus attorney's fees, costs, disbursements and interest.

Dated: New York, New York
        December 19, 2006

                          LAW OFFICES OF SCOTT A. LUCAS
                          The Lincoln Building, Suite 1001
                          60 East 42nd Street
                          New York, New York 10165
                          (212) 573-6906
                          *Attorneys for Plaintiff Barbara Rockmore*

                          By_____
                                    Scott A. Lucas

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------X
BARBARA ROCKMORE,                           Index No. 06-118789

                    *Plaintiff,*

          -against-                          **VERIFIED**
                                             **COMPLAINT**
DARRICK E. ANTELL,
DARRICK E. ANTELL, M.D., D.D.S., P.C.,
DARRICK E. ANTELL, M.D., D.D.S., P.C., F.A.C.S.,
DARRICK E. ANTELL, M.D., F.A.C.S. and
DARRICK E. ANTELL, M.D., F.A.C.S., P.C.,

                    *Defendants.*
-----------------------------------------------------------X

          Plaintiff BARBARA ROCKMORE ("Plaintiff"), by her attorneys, the Law

Offices of Scott A. Lucas, alleges as follows for her Verified Complaint against

Defendants DARRICK E. ANTELL, DARRICK E. ANTELL, M.D., D.D.S., P.C.,

DARRICK E. ANTELL, M.D., D.D.S., P.C., F.A.C.S., DARRICK E. ANTELL,

M.D., F.A.C.S. and DARRICK E. ANTELL, M.D., F.A.C.S., P.C.:


## INTRODUCTION

          1.  This case involves a hostile work environment permeated by virulent

anti-Semitism, misogyny and discriminatory and hate-filled depravity, all of which

was practiced and perpetrated by Darrick E. Antell, the man who owns and

controls the company that employed Plaintiff.

## THE PARTIES

2. Plaintiff Barbara Rockmore is a natural person residing at 200 West 79th Street in Manhattan.

3. Defendant Darrick E. Antell is a natural person who, upon information and belief, resides in Greenwich, Connecticut.

4. Upon information and belief, each of the other above-named Defendants is, and at all times mentioned herein was, a professional corporation organized and existing under the laws of the State of New York, located in Manhattan, currently at 850 Park Avenue.

5. Upon information and belief, to the extent they were different from one another, at all times mentioned herein each Defendant was the agent of each other Defendant, and in doing the things alleged in this Complaint was acting within the course and scope of such agency.

## JURISDICTION & VENUE

6. This Court has subject matter jurisdiction under CPLR § 301, *et seq.*

7. Venue is proper in New York County under CPLR § 503(a) and (c) based on: (A) Plaintiff's residence; (B) Defendants' place of business; and (C) the fact that Manhattan is where each of the acts and occurrences alleged herein occurred.

2

8.  A copy of the Complaint will be served on the New York City Commission on Human Rights and Corporation Counsel contemporaneously with service on Defendants and filing with the Court.

## FACTS[1]

9.  Over the course of Plaintiff's employment, the office where Plaintiff reported to work was usually identified as Darrick E. Antell, M.D., D.D.S., P.C.

10. However, at various times it was also identified as Darrick E. Antell, M.D., D.D.S., P.C., F.A.C.S., Darrick E. Antell, M.D., F.A.C.S. and Darrick E. Antell, M.D., F.A.C.S., P.C.

11. Upon information and belief, Darrick E. Antell is the sole owner of Defendant Darrick E. Antell, M.D., D.D.S., P.C.

12. Upon information and belief, Darrick E. Antell is the sole owner of Darrick E. Antell, M.D., D.D.S., P.C., F.A.C.S., Darrick E. Antell, M.D., F.A.C.S. and Darrick E. Antell, M.D., F.A.C.S., P.C. (to the extent they are different from Darrick E. Antell, M.D., D.D.S., P.C.).

13. Upon information and belief, Defendant Darrick E. Antell is and at all times mentioned herein was the principal of Darrick E. Antell, M.D., D.D.S., P.C. and of each of the other named Defendants to the extent they are different from Darrick E. Antell, M.D., D.D.S., P.C.

---

[1] All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

3

14. References herein to "Dr. Antell" include Darrick E. Antell and the other named Defendants, all of which were controlled by Dr. Antell, as one or more of them constituted Plaintiff's actual employer.

15. Upon information and belief, by using varying names to describe Plaintiff's true employer, Dr. Antell was acting at all times mentioned herein as an agent for a partially disclosed principal.

16. Upon information and belief, at all material times herein each of the Defendants employed not less than four employees, including Plaintiff.

17. Plaintiff's employment, as described in greater detail herein, began in December 1993 and continued through July 29, 2004.

18. Plaintiff is a member of the Jewish faith.

19. Plaintiff is a member of the Jewish religion.

20. Plaintiff is female.

21. Plaintiff was first exposed to Dr. Antell's anti-Semitism on her first or second day of employment, when Dr. Antell wanted Plaintiff to telephone a person who was apparently Jewish.

22. Referring to that person, Dr. Antell ordered Plaintiff to *"Get that Jew on the phone."*

23. Plaintiff immediately got up and walked away in disgust.

24. Upon information and belief, moments later a co-worker named Josephine Maggio told Dr. Antell that Plaintiff was Jewish.

4

25. Upon information and belief, Dr. Antell was unaware that Plaintiff was Jewish when Plaintiff was hired.

26. Plaintiff began acting as the *de facto* office manager after the regular office manager quit and there was nobody else to perform the office manager functions. Although Plaintiff proved herself to be highly capable, dependable and reliable in performing those functions, Dr. Antell sought to prevent her from continuing in that role by hiring three other "office managers," each of whom quit or was fired in rapid succession, at which point Plaintiff became the office manager by default and resumed her performance of the officer manager role.

27. Dr. Antell's knowledge that Plaintiff was Jewish did nothing to diminish Dr. Antell's willingness to subject Plaintiff to openly anti-Semitic conduct.

28. To the contrary, beginning shortly after Plaintiff became an employee, and continuing until Plaintiff ceased to be an employee, Dr. Antell, both individually and in his capacity as principal the other Defendants, subjected Plaintiff to an ongoing and unwelcome course of discriminatory, intimidating and demeaning conduct and blatantly anti-Semitic, racist and misogynistic statements.

29. Upon information and belief, Dr. Antell was emboldened by the fact that he perceived Plaintiff as a person who was weak and had low self esteem.

30. Upon information and belief, it gave Dr. Antell a sense of power to be able to lord his anti-Semitic and depraved misconduct over a Jewish female who lacked the courage and self-esteem to stand up for herself.

31. Accordingly, when Dr. Antell decided he would pressure one of his employees to log onto the KKK's website so that his P.O. box could be added to the KKK's mailing list, the person he initially targeted to carry out this request was Plaintiff, even though he knew she was Jewish and would be deeply offended or sickened by the idea.

32. To "justify" this request, Dr. Antell told Plaintiff he needed her to do it for him because the government monitored the traffic on such sites and he was afraid of ending up on an FBI watch list.

33. Despite her economic need to remain employed, Plaintiff was so sickened by this suggestion that she immediately and adamantly refused.

34. Upon information and belief, Dr. Antell then instructed Eva Taczanowski, a co-worker of Plaintiff, to do so, and Ms. Taczanowski told him she would do so.

35. Upon information and belief, Ms. Taczanowski went home that night and wept about the situation, and her then-fiancé, upon information and belief, urged her to call in the next day and quit over the phone.

36. Ms. Taczanowski later confided in Plaintiff that she had not followed Dr. Antell's instructions.

37. In June or July of 2004, after a malpractice suit was filed against him, and at a time when he was facing serious legal claims, including an ongoing investigation by the federal government, Dr. Antell alluded to his legal problems and identified himself with Adolph Hitler, telling Plaintiff: *"Hitler was a great*

6

*man and he could have won the War.  The only problem was that he was fighting too many battles at once, just like I am."*

38. Shortly after Plaintiff's employment began, Dr. Antell assigned Plaintiff the lengthy task of reviewing and sorting a huge stack of Dr. Antell's documents that had accumulated.

39. In addition, regularly until sometime in 1995, and less frequently thereafter, Plaintiff was required to open, sort and file Dr. Antell's mail, and to file documents that Dr. Antell would leave for Plaintiff to file.

40. In connection with her duties to open letters and sort and file documents, Plaintiff was required to sort and file documents from Dr. Antell and a small number of his close associates which referred to Jewish people as *"Code 3"*.

41. Based on his interest in the KKK, his stated admiration of Adolph Hitler, his obsession with Jewish people and his anti-Semitic statements and behaviors, as well as the context in which the term appeared, Dr. Antell and his very close associates were, upon information and belief, using the term *"Code 3"* to imply that Jews are the equivalent of a scourge or contagion or that they are loathsome.

42. In late 2002 or in 2003, Dr. Antell ordered Plaintiff to call the anesthesiologist's office and instruct them not to send certain minorities to Dr. Antell's office.

43. Specifically, Dr. Antell ordered Plaintiff: *"Tell them [i.e., the anesthesiologist's office] no schwatzas, no Jews with yarmulkes or accents, no*

*towelheads, no chicks other than the chicks who have been here, no Chinese, no camel jockies."*

44. Plaintiff was ashamed and embarrassed when she recited Dr. Antell's instructions to the contact person at the anesthesiologist's office.

45. With respect to patients who had Jewish surnames or who he perceived as having Jewish-sounding accents, Dr. Antell repeatedly warned Plaintiff: *"They're going to try to handle you down. Don't let them do it."*

46. On several occasions, Dr. Antell purported to justify such discriminatory warnings by telling the story from early in his medical career of a man with a "Jewish accent" whose child was stitched up by Dr. Antell in the emergency room, and who was paid by the insurance company but failed to remit payment for the surgery.

47. Throughout her employment, Plaintiff sought to avoid being thought of by Dr. Antell as Jewish and sought to downplay the fact that she was Jewish.

48. Nevertheless, while speaking to Plaintiff, Dr. Antell often referred to Jews as *"you people,"* and, in a snide tone, often asked Plaintiff to explain or justify the basis for Jewish customs.

49. In addition to the foregoing conduct, Dr. Antell made numerous statements demonstrating his hatred of Jews. By way of example, and not by way of limitation:

        (A)    In a state of agitation, Dr. Antell approached Plaintiff and

               demanded that she tell him whether a blue-eyed red-haired

8

employee named Alice Hafter was Jewish, asking *"Is Alice Jewish? She's not Jewish is she?"* When Plaintiff did not respond, Dr. Antell continued demanding to know, *"Is she Jewish? Is she Jewish? Is she Jewish?,"* over and over, in a state of increasing agitation. Plaintiff was dumbfounded, and continued to remain silent, at which point Dr. Antell said that Ms. Hafter either "smells" like a Jew or "smells" like "an old Jewish woman." Upset by Dr. Antell's anti-Semitic obsession, Plaintiff yelled back at him *"I don't know if she's Jewish! Why don't you ask her!"*

(B)    After being sued by a patient whose attorney had a Jewish surname, Dr. Antell stood clutching and waving what was presumably a summons and complaint, and angrily exclaimed to Plaintiff *"Look at that! Her lawyer's Jewish. He's a Jew boy. I hate those Jew boys!"*

(C)    On several occasions Dr. Antell pretended to imitate accented Jewish workers at 47th Street Photo by waving his outstretched palm and declaring in an exaggerated accent, *"Cash, Cash, Cash. Gimmie Cash, Cash, Cash"*.

(D)    Regarding one of the attorneys from the firm representing Dr. Antell in a federal investigation, and who has a Jewish

9

surname, Dr. Antell informed Plaintiff "*I can't use him because he's one of those.*"

(E)    Upon learning that a patient named Marsha Johnson with whom he was friends was apparently engaged to marry a man with the last name "Berger," Dr. Antell said to Plaintiff "*She wouldn't marry a Jew would she?  I can't believe she would marry a Jew.*"

(F)    After telling Plaintiff that he went to a party hosted at a Jewish person's mansion with a large art collection and an underground parking lot with fancy cars, Dr. Antell demanded that Plaintiff explain to him, "*How does a Jew get all of that?*"

(G)    On several occasions Dr. Antell made derisive comments about the fact that his physician's assistant was engaged to marry a Jewish man.

50. The hostility of Plaintiff's work environment was also exacerbated by Dr. Antell's unlawful discrimination against other minorities and especially by Dr. Antell's requests that Plaintiff carry out his discriminatory orders.

51. For example, on numerous occasions Dr. Antell told Plaintiff "*I don't want any schwatzas [i.e.,* African-Americans] *in the waiting room,*" and told her to put such patients in exam rooms so that his other patients would not see them.

10

52. In addition, while Dr. Antell sought to generate positive publicity for his practice by participating in certain programs designed to help underprivileged and largely African-American children, when such African-American children showed up at his office Dr. Antell ordered Plaintiff to segregate them from the other patients by promptly and prematurely moving them to exam rooms so they would not be seen by other patients.

53. Dr. Antell repeatedly told Plaintiff that such children were "*pickaninnies*" – a term that is a racist relic of the Jim Crow era and is seldom used today except, upon information and belief, by hard-core racists.

54. Dr. Antell's racist instructions for segregating most African-American patients from white patients placed emotional strain on Plaintiff, who generally acted as though she was going to comply, and on those occasions when it was obvious to Dr. Antell that Plaintiff had not followed instructions, Plaintiff pretended to have forgotten to do so.

55. On several occasions when speaking to Plaintiff, Dr. Antell referred to his Greenwich, Connecticut home as "*the Plantation*," and, upon information and belief, had either one or two live-in domestic servants of African-American descent working for him there.

56. Dr. Antell also made discriminatory remarks about persons of other races or ethnicities, and other minority groups.

57. For example, when Dr. Antell needed a new full-time receptionist, Plaintiff and another employee repeatedly urged him to offer the position to the

11

temporary receptionist because she did an excellent job, was well qualified, and was attractive. However, Dr. Antell refused to offer her the job despite her qualifications, as she was a dark-skinned woman of South American descent. As Dr. Antell explained to Plaintiff *"That's not what I want at my front desk."*

58. In addition, Dr. Antell often insinuated that Italian-Americans were "mafia" or were connected to "the Mafia".

59. Dr. Antell also referred to gay men as "fags," and declared that they are "disgusting".

**Dr. Antell Unlawfully Attempts to Shield his Longstanding Misconduct from Judicial Scrutiny, and From any Venue in Which Punitive Damages Could be Imposed Against Him**

60. After a Jewish employee named Alice Hafter sued him for compensatory and punitive damages for unlawful discrimination, retaliation, and extreme, offensive, egregious and outrageous infliction of emotional distress for his workplace anti-Semitism, Dr. Antell's civil lawyer (Brian Conneely, Esq.) interviewed Plaintiff and, upon information and belief, one other employee.

61. When Mr. Conneely asked Plaintiff if Dr. Antell made anti-Semitic statements, she answered him truthfully.

62. Upon information and belief, Ms. Hafter's lawsuit with Dr. Antell was thereafter settled by Dr. Antell.

63. Referring to his legal dispute with Ms. Hafter that he had apparently settled, Dr. Antell told Plaintiff "*You should have lied to Mr. Conneely. Thanks a lot. You just cost me a lot of money.*"

64. Thereafter, Dr. Antell sought to shield his longstanding pattern of misconduct against Plaintiff and others from any tribunal to which the public would have access, and which possessed authority to impose punitive damages against him.

65. Specifically, Dr. Antell handed Plaintiff a one sentence document purporting to be an arbitration agreement, and told her she would be fired if it was not signed and returned by the following day.

66. Dr. Antell also ordered Plaintiff to give similar purported arbitration agreements to other employees to sign.

67. Unable to risk losing her income, Plaintiff signed the purported arbitration agreement.

68. The purported arbitration agreement was obviously not drafted by a lawyer, and is a nullity for at least five separate reasons, namely: (a) it does not identify the other party to the "agreement"; (b) it purports to be a unilateral contract, enforceable only against Plaintiff; (c) no consideration was given by the unnamed employer in exchange for Plaintiff signing it; (d) it was signed under duress; and (e) it purports to insulate Plaintiff's unnamed employer from well-deserved punitive damages liability by requiring that any dispute be resolved by a tribunal with no authority to impose punitive damages.

13

**Dr. Antell's Harassment of Plaintiff**
**After She Truthfully Answered Questions**
**Put to Her by Investigators**

69. Upon information and belief, as a result of his anger at Plaintiff for being truthful with investigators, including Mr. Conneely, Dr. Antell began harassing Plaintiff about supposed infractions of his attendance policy.

70. In response, Plaintiff carefully demonstrated to Dr. Antell that his purported concern was baseless and that, if anything, she was spending more time at work in a typical day that she was supposed to spend at work without receiving any additional compensation.

71. In addition, Dr. Antell sought to demean Plaintiff and undermine her authority as office manager by vesting the temporary receptionist with the authority to require Plaintiff to impose unspecified punishments or reprimands on employees who violated Dr. Antell's attendance rules, and without giving Plaintiff authority to impose any actual discipline for attendance-related violations.

72. Shortly after Defendants' billing manager announced that she would be retiring soon, Dr. Antell informed Plaintiff that he would hire a new office manager to replace Plaintiff and move Plaintiff to the position of billing manager, effectively demoting Plaintiff. Plaintiff was thereafter required to interview the candidates competing to take her job as office manager.

14

**Dr. Antell's Depraved, Misogynistic
and Otherwise Sexist Conduct**

73. At all material times herein, besides subjecting Plaintiff to virulent anti-Semitism, Dr. Antell made Plaintiff's working conditions even more intolerable by subjecting Plaintiff to an ongoing course of offensive speech and conduct of an explicitly sexual and misogynistic nature and other gender-related discriminatory conduct.

74. On dozens of occasions Dr. Antell left hardcore pornography on his computer screen and asked Plaintiff to go look something up on his computer or to get something from his desk, thus deliberately or recklessly forcing her to be confronted by vile sexual imagery.

75. Some of the imagery that Dr. Antell left up on his screen was positively sickening, and consisted of female humans engaged in sex acts with animals.

76. In addition, in connection with her periodic duties to open, sort and file mail and other documents for Dr. Antell, Plaintiff was confronted with extremely graphic sexual photographs to Dr. Antell from a small number of close friends and associates.

77. On one occasion, the sexually explicit materials in question, which Plaintiff opened in the normal course of business and which had been mailed to Dr. Antell by a close friend with a personal note inscribed thereon, were of such a nature that Plaintiff was too afraid to pass them on to Dr. Antell because Dr.

15

Antell would know that she had seen them. While Plaintiff also feared that Dr. Antell might infer that she had seen such materials because he never received them, she was even more afraid that Dr. Antell would think she perceived him to be of a certain sexual persuasion, and would retaliate against her for having such a perception of him.

78. On another occasion, the sexually explicit material consisted of a personal note and a disturbing and sadistic photograph of a naked woman with her arms tied behind her back suspended in air, with her face concealed from view.

79. Pornographic magazines also appeared regularly at the office for Dr. Antell.

80. In addition, upon information and belief Dr. Antell often sought to intimidate and embarrass Plaintiff through sexual innuendo, and grinned about it while relishing the obvious discomfort caused by his disgusting and offensive speech and conduct.

81. For example, on numerous occasions while Plaintiff was taking dictation, Dr. Antell would often pronounce a letter of the alphabet and add a gratuitous sexual reference or a gratuitous insult that begins with the same letter.

82. For example, Dr. Antell would say "'S,' as in 'sex'," or "'P,' as in 'penis'," or "'S,' as in 'stupid'," or "'I,' as in 'idiot'."

83. Upon information and belief, Dr. Antell made similar sexual comments to other females employees, and also informed one or more of them that his penis "hang[s] to the left."

16

84. Dr. Antell often intimidated and embarrassed Plaintiff by requiring her to look directly at him as he made overtly sexual gestures while Plaintiff filled out the "fee sheet" listing the type of liposuction a patient was to have.

85. As to all but one of the liposuction procedures, Dr. Antell would simply recite the area of the body that was to receive liposuction. However, when the patient was to have liposuction on the "upper inner thighs," Dr. Antell was not content to simply say "upper inner thighs". Instead, while he was standing up and facing Plaintiff, who was seated, Dr. Antell would also gratuitously place his hands on his upper inner thighs and rub vigorously, saying *"Here, look at me,"* or *"Here. She wants it right here."*

86. In addition, after handing Plaintiff an innocuous looking "facial vibrator" that he had ordered for plastic surgery patients, and that was too strong for its intended use, Dr. Antell, in a sexually suggestive tone, told Plaintiff that she should keep it and consider using it on other parts of her body.

87. Dr. Antell also routinely embarrassed Plaintiff by standing outside the door to the women's bathroom, and talking to her through the door while she was going to the bathroom. On at least two occasions, Plaintiff made it clear to Dr. Antell that she considered such conduct to be inappropriate, but it had no impact on Dr. Antell's behavior.

88. Although Plaintiff was the office manager, and did not have cleaning duties, Dr. Antell invented a demeaning cleaning duty by ordering Plaintiff and another female employee on several occasions to *"Polish my cannon."* Dr. Antell

17

sometimes grinned while giving this order, or while the brass replica cannon on his desk was being polished.

89. To further show his dominance, and further embarrass Plaintiff, Dr. Antell often called Plaintiff into his office prior to going to the operating room and began to partially undress himself in her presence.

90. Calling attention to his every movement, Dr. Antell would begin by removing watch, his wedding ring, his pinky ring and cufflinks (when wearing them), and would then unbutton his shirt all the way, often exposing his chest and stomach, and would also often unbuckle his belt before allowing Plaintiff to be excused.

91. Dr. Antell's disrespect for women and his view of them as subservient beings was also evidenced by the fact that, upon information and belief, he had a policy of not providing married female employees with health insurance available to other employees, including Dr. Antell himself, a married male employee.

92. In addition, Dr. Antell tried to pressure Plaintiff into getting a facelift in the hope that Plaintiff would conform her appearance to Dr. Antell's idea of what a female office employee should look like, and so that her "uplifted" face could be used as a "prop" to help Dr. Antell sell facelift operations to his female patients.

93. Upon information and belief, Dr. Antell directly or indirectly told at least two people who depended on him for income that they should speak to Plaintiff about getting a facelift.

94. In turn, these two people each spoke to Plaintiff on multiple occasions about how Dr. Antell really wanted her to have a facelift.

95. Moreover, in an attempt to pressure Plaintiff directly, Dr. Antell asserted to Plaintiff that *"All women over 40 are old bags."*

96. Unwilling to have a facelift, but eager to placate Dr. Antell so that the subject of her allegedly inadequate face would not remain a topic of discussion, Plaintiff told Dr. Antell that she would have a facelift even though she had no intention of having one.

97. To avoid a confrontation with Dr. Antell, Plaintiff then postponed the scheduled facelift operation that she had no intention of actually undergoing.

98. Thereafter, in lieu of a facelift, Plaintiff asked Dr. Antell about having breast augmentation surgery.

99. Dr. Antell told Plaintiff that if she had breast augmentation surgery, it would serve as a selling point for his plastic surgery services.

100.    However, upon information and belief, Dr. Antell liked the idea of a breast augmentation operation on Plaintiff even more than the idea of a facelift because he could use it as an opportunity to perform unauthorized experimental surgery.

19

101.    Upon information and belief, Dr. Antell targeted Plaintiff for unauthorized experimental surgery once the opportunity presented itself because he views women as weak in general and viewed Plaintiff as a woman who was particularly weak and who would be too non-confrontational to assert her rights if the unauthorized experiment turned out badly.

102.    Accordingly, without telling Plaintiff that he was performing anything other than routine breast augmentation surgery, Dr. Antell performed a rare and risky type of breast augmentation surgery which, upon information and belief, he had never performed before and was not qualified to perform.

103.    The result was a horribly botched operation, followed by a horribly botched attempt to undo the experiment, requiring Plaintiff's admission to the emergency room two days later and major surgery several months later by a different physician who, after examining the aftermath of Dr. Antell's experiment, diagnosed Plaintiff as having "gross deformities of the breasts".

**Circumstances Aggravating the Hostility
of Dr. Antell's Discriminatory Conduct**

104.    The stress and anxiety experienced by Plaintiff was heightened by an increase in the means through which Dr. Antell's hate and depravity could find expression, and by the lurking fear of what could happen as a result if workplace violence or some other unusual or threatening circumstances occurred.

20

105.     For example, besides possessing an apparently loaded handgun in his office, Dr. Antell, upon information and belief, often injected himself with unprescribed narcotics.

106.     Dr. Antell's ability to exercise any level of control over his vile and discriminatory impulses depended on his ability to engage in rational decision-making, and that ability was, upon information and belief, diminished by his apparent use of unprescribed narcotics.

107.     As a result, the hostility of the work environment to which Plaintiff and other of Dr. Antell's employees were subjected was increased, because Dr. Antell's vile and discriminatory impulses were more likely to be expressed in the context of severe mood swings and highly erratic behavior.

108.     For example, when Plaintiff told Dr. Antell that the doctor from the adjacent office was using the top drawers of a shared filing cabinet, Dr. Antell, while standing too close for comfort (about two or three feet from Plaintiff), exploded in a red-faced rage, physically and verbally cursing by alternately pumping his right and left arms in the air with his middle fingers extended and angrily exclaiming *"FUCK HIM! FUCK HIM! FUCK HIM!"*

109.     In addition, besides experiencing the extreme fear and anxiety of what might happen to an innocent patient or to Dr. Antell himself, Plaintiff was effectively forced to wrap her arms around her perverted employer's torso and walk him around the office while physically supporting him because Dr. Antell

21

collapsed to his knees shortly after leaving the operating theater and told Plaintiff that he would die if he lied down.

110.    Even more disconcerting to Plaintiff was Dr. Antell's deeply malevolent character, as it added to a lurking fear of what could happen to the objects of Dr. Antell's discrimination (for example, Plaintiff) if workplace violence were to erupt or some other unusual or threatening circumstance were to occur.

111.    Dr. Antell's malevolence was evidenced by, among other things, the perverse pleasure he derived from the suffering of others, especially people he envied, members of minority groups he despised, and people he could oppress at little or no risk to himself.

112.    For example, upon information and belief, in May 2004, shortly after an American Jewish hostage named Nick Berg was beheaded by Islamic militants, the actual footage of which was said to have been released on the internet through an extremist website, Dr. Antell asked a temporary worker to go online and find him the decapitation video.

113.    The temporary worker then asked Plaintiff for her help in finding the decapitation video for Dr. Antell.  When both women told Dr. Antell that they found the video of the beheading that he requested, Dr. Antell suddenly became self-conscious and began denying that he requested it.

114.     In addition, Dr. Antell interrupted Plaintiff's work duties for the purpose of telling her – with a gleam in his eye and a demented grin – about how one of his wealthy neighbors died of a brain tumor.

115.     Dr. Antell also interrupted Plaintiff's work duties to tell Plaintiff that a very highly regarded plastic surgeon (whom he was very jealous of) tried to commit suicide. Dr. Antell then declared with exuberance *"Another one bites the dust!,"* and proceeded to compose a letter to the surgeon offering to take his patients off of his hands.

116.     Dr. Antell also interrupted Plaintiff's work duties to tell Plaintiff that another plastic surgeon was diagnosed with cancer, and to declare with exuberance *"Another one bites the dust!"*

117.     Thereafter, Dr. Antell again composed a letter offering to relieve that surgeon of his patients.

118.     When Plaintiff informed Dr. Antell that one of his patients began crying to Plaintiff because her husband had committed suicide by jumping out of a window after making a bad investment, Dr. Antell looked at Plaintiff and responded, without any trace of emotion, *"He did the right thing."*

119.     In addition, on those occasions when a given female employee (including Plaintiff, among others) was sick or not feeling well, Dr. Antell often took advantage of the employee's weakened state by standing over her and gratuitously hounding her.

23

120.    In addition, upon information and belief, Dr. Antell ordered a book through Amazon about medical experiments that the Nazis performed on twins.

121.    After telling Plaintiff that he had ordered this book through Amazon, Dr. Antell's face lit up and he told Plaintiff, in a tone of enthusiasm and wide-eyed anticipation, about how he could not wait for the book to arrive.

122.    In the same tone of excited anticipation, Dr. Antell told Plaintiff that Nazi experimenters used to make people have sex with animals, and that they injected people with bleach to see what would happen.

123.    Upon further information and belief, such Nazi medical experiments did not constitute legitimate medical science, and would not have been necessary for Dr. Antell to study in order to further his clinical understanding of medical issues relating to his patients who are twins.

124.    With his record of blatant anti-Semitism, it seems inconceivable that Dr. Antell's fervent interest in Nazi medical experiments stemmed from any humanistic impulse on Dr. Antell's part to understand how men could have committed such atrocities. Rather, under the circumstances it seems very likely that Dr. Antell's excitement about Nazi medical experiments stemmed from his being enthralled with the very fact that Jews and other supposedly undesirable people were subjected to cruel and bizarre medical experimentation by the Nazis.

125. The fact that racial factors would likely affect Dr. Antell's judgment in an extreme or unusual situation was also apparent from Dr. Antell's conduct following the attacks of September 11th.

126. Dr. Antell, who identifies himself as being Polish, showed Plaintiff two gas masks he ordered in the event of a future terror attack, and told Plaintiff *"You don't get one. Eva* [another employee] *gets one because she's Polish."*

127. The lurking fear of what could happen to the objects of Dr. Antell's discrimination (for example, Plaintiff) if workplace violence were to erupt or some other unusual or threatening circumstance were to occur was also heightened by the knowledge that Plaintiff's life and well-being had no value whatsoever to Dr. Antell.

128. For example, when a patient furious with the outcome of her surgery threatened violence against Plaintiff after Dr. Antell refused to speak to her and locked himself in his office, Dr. Antell ignored Plaintiff's pleas for help and left Plaintiff to fend for herself and bear the wrath that was intended for Dr. Antell.

129. The danger did not subside until Plaintiff managed to surreptitiously call the police, who came shortly thereafter to remove the patient, after which time Dr. Antell emerged from his office and began grinning about the perilous situation to which he had subjected Plaintiff.

25

130.    Upon information and belief, Dr. Antell would have responded differently to the threat of violence if Plaintiff, instead of being a so-called "Code 3" (a Jew), was of a racial pedigree that Dr. Antell valued.

131.    Plaintiff expected that Dr. Antell would again use her to absorb the wrath of an angry patient if another such situation were to occur, and Dr. Antell himself feared violence from one or more of his other angry patients, which is why he kept an apparently loaded handgun in his office.

132.    Likewise, just as he thought Plaintiff should subject herself to government monitoring by logging onto the KKK website so that he could receive that organization's hate literature, Dr. Antell also thought that Plaintiff should subject herself to potential federal prosecution and incarceration if doing so would provide even a minimal benefit to Dr. Antell.

133.    Specifically, when Dr. Antell learned through his attorneys that Plaintiff was approached and questioned by federal agents about some of his business practices, and the agents warned her that she could go to jail if she told him they had questioned her, Dr. Antell told Plaintiff that she should have told him anyway, even if it meant that she would go to jail.

26

**Circumstances Surrounding Plaintiff's Separation
from Employment**

134.    Dr. Antell, through his counsel, volunteered to reimburse Plaintiff and another employee for whatever legal fees they incurred in connection with their expected testimony in another matter involving Dr. Antell.

135.    Plaintiff and the other employee each accepted Dr. Antell's offer.

136.    Several months later, after Dr. Antell informed Plaintiff that she was to be replaced as office manager, another physician offered Plaintiff a job with comparable compensation.

137.    Plaintiff immediately accepted the offer and gave Dr. Antell three week's notice.

138.    When Plaintiff was preparing to depart the office at or about 5:00 p.m. on her last day of work, Dr. Antell approached her after she picked up her purse, and said *"not so fast."*

139.    He then held up a check in one hand and a purported release in the other.

140.    Dr. Antell told Plaintiff that the check was for fees charged by the law firm that represented Plaintiff in connection with the above-referenced matter involving Dr. Antell (and which Dr. Antell had previously promised to pay).

141.    Looking at the purported release he was holding in his hand, Dr. Antell told Plaintiff *"If you don't sign this form, this check's getting ripped up, your attorney's fees won't get paid, and you won't get your pay, or your pension or anything else."*

142.    Plaintiff lacked the resources to file and prosecute a lawsuit against Dr. Antell to receive her pay, her pension, or her reimbursement of legal fees. Accordingly, she signed the purported release.

143.    The purported release was and is invalid because, among other things, it was procured through blatant economic coercion and duress.

28

## FIRST CAUSE OF ACTION

### VIOLATIONS OF NEW YORK CITY
### HUMAN RIGHTS LAW ("NYCHRL") § 8-107, *et seq.*

144.    Plaintiff repeats and re-alleges the allegations of paragraphs 1
- 143 as if set forth herein.

145.    At all times during her employment as referred to herein,
Plaintiff was an "employee" as that term is used in the New York City Human
Rights Law.

146.    Defendants subjected Plaintiff to unwelcome race-based,
religious-based and gender-based discrimination, intimidation, ridicule and insult.

147.    While Dr. Antell subjected Plaintiff to such behavior in part
because he perceived her as weak, he did, on numerous occasions, subject other
female and minority employees to offensive speech, conduct and discrimination,
and such behavior added to the hostility of Plaintiff's work environment and
reinforced the sense that it was hopeless to think that Dr. Antell would ever cease
his hostile and discriminatory behavior.

148.    In addition, while she was generally intimidated by Dr. Antell
and generally lacked the courage, confidence or fortitude to stand up for herself
and directly challenge him on his vile, misogynistic and discriminatory conduct, in
many instances Plaintiff clearly did express to Dr. Antell her disapproval to his
conduct, and she did so in a variety of ways, including, for example, by getting up
and walking away (*e.g.*, when Dr. Antell told her to *"Get the Jew on the phone"*),

29

by yelling at Dr. Antell (*e.g.*, after Dr. Antell said that Ms. Hafter "*even smells like a Jew!*"), by refusing to follow Dr. Antell's instructions (*e.g.*, when she refused to log onto the KKK's website), by defending herself against Dr. Antell's retaliatory accusations (*e.g.*, after Dr. Antell harassed her about supposed infractions of Dr. Antell's attendance policy), by pleading with Dr. Antell not to leave her in danger (*e.g.*, after Dr. Antell left Plaintiff to bear the risk of violence from an out-of-control patient), by looking away (*e.g.*, on the many occasions when Dr. Antell placed his hands on his groin area, and the many occasions when Dr. Antell partially undressed himself in her presence), by verbally telling Dr. Antell in substance that his behavior was inappropriate (*e.g.*, when she tried to get Dr. Antell to stop his practice of speaking to her while she was going to the bathroom), by responding in a tone of disapproval (on numerous occasions), and by responding with facial gestures indicating her disapproval (on numerous occasions).

149.    Every one of the challenged statements and actions alleged herein was made by Dr. Antell, the highest decision-maker of each of the other Defendants.

150.    The unwelcome conduct alleged herein was severe enough to create an objectively hostile work environment and Plaintiff perceived it as such.

151.    Said unwelcome conduct was also pervasive enough to create a hostile work environment, and Plaintiff perceived it as such.

152.    Said unwelcome speech and conduct was also sufficiently frequent and ongoing throughout the duration of Plaintiff's employment as to constitute a continuing violation.

153.    As a result of said unwelcome conduct, Plaintiff experienced intimidation, diminished self-esteem, fear, humiliation, embarrassment, degradation, anxiety and feelings of anger, sadness and stress comparable to what another Jewish female in Plaintiff's position would be expected to experience under the circumstances described herein.

154.    As the foregoing conduct violated NYCHRL § 8-107, *et seq.*, Defendants are liable to Plaintiff for compensatory damages in an amount to be determined at trial, but which is believed to be not less than $1,000,000, together with statutorily authorized punitive damages and attorneys fees. (NYCHRL § 8-502)

155.    In addition, in light of the willful, wanton and reckless nature of Defendants' conduct as aforesaid, and the substantial public interest in deterring and punishing such reprehensible conduct, punitive damages should be imposed against Defendants under common law in an amount sufficient to punish Defendants and to deter Defendants and other employers from engaging in similar misconduct in the future.

31

## SECOND CAUSE OF ACTION

## VIOLATIONS OF 42 USC § 1981

156.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 - 155 as if set forth herein.

157.    Dr. Antell's racially discriminatory conduct as aforesaid created a hostile work environment and deprived Plaintiff of an equal right to the making, performance, modification, and termination of her at will employment contract, and to the benefits, privileges, terms, and conditions of said contractual relationship.

158.    As the perpetrator of such conduct, Dr. Antell is liable under 42 U.S.C. § 1981 for his actionable conduct, as are each of the Defendants that constituted Plaintiff's legal employer or legal joint employer.

159.    As a result of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but which is believed to be not less than $1,000,000.

160.    In addition, in light of the willful, wanton and reckless nature of Defendants' conduct as aforesaid, and the substantial public interest implicated by Defendants' conduct, punitive damages should be imposed against Defendants in an amount sufficient to punish Defendants and to deter similar misconduct by Defendants and other employers.

32

**WHEREFORE,** Plaintiff respectfully requests judgment in an amount to be determined at trial, but which is believed to be not less than $1,000,000, plus attorney's fees, punitive damages, interest and costs, computed as follows:

(a) On her first cause of action, in an amount to be determined at trial, but which is believed to be not less than $1,000,000, together with attorney's fees, costs, disbursements and interest at the legal rate, and the imposition of punitive damages in an amount sufficient to punish Defendants and to deter similar misconduct by Defendants and other employers;

(b) On her second cause of action, in an amount to be determined at trial, but which is believed to be not less than $1,000,000, together with attorney's fees, costs, disbursements and interest at the legal rate, and the imposition of punitive damages in an amount sufficient to punish Defendants and to deter similar misconduct by Defendants and other employers; and

(c) such other and further relief as may be just and proper.

Dated:    New York, New York
          March 26, 2007

LAW OFFICES OF SCOTT A. LUCAS
The Lincoln Building - Suite 1001
60 East 42nd Street
New York, New York 10165
(212) 573-6906
*Attorneys for Plaintiff Barbara Rockmore*

By _____
          Scott A. Lucas

33

## PLAINTIFF'S VERIFICATION

STATE OF NEW YORK )
SS.:
COUNTY OF NEW YORK )

BARBARA ROCKMORE, being duly sworn, deposes and says:

I am the Plaintiff in this action. I have read the foregoing Complaint, and

know the contents thereof; and that the same are true to my knowledge, except for

those matters stated to be on information and belief; and as to those matters, I

believe them to be true.

BARBARA ROCKMORE

Sworn to before me this
26th day of March 2007

Notary Public

SCOTT LUCAS
Notary Public, State of New York
No. 02LU5049081
Qualified in Kings County
Commission Expires September 6, 2009

34

IRS Circular 230 Notice: Any tax advice in this message or in any attachment (i) is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any tax penalties that may be imposed by the I.R.S. and (ii) should not be used in promoting, marketing or recommending to another party any matter addressed herein.



**EXHIBIT 2**

**LITTLER MENDELSON**
A Professional Corporation
885 Third Avenue, 16th Floor
New York, NY 10022.4834
Telephone: 212.583.9600

Christina L. Feege, Esq.
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA ROCKMORE, | Civil Action No. |
| Plaintiff, | |
| -against- | |
| DARRICK E. ANTELL, DARRICK E. ANTELL, M.D., D.D.S., P.C., DARRICK E. ANTELL, M.D., D.D.S., P.C., F.A.C.S. DARRICK E. ANTELL, M.D., F.A.C.S. and DARRICK E. ANTELL, M.D., F.A.C.S., P.C., | **NOTICE TO ADVERSE PARTY OF FILING OF NOTICE OF REMOVAL** |
| Defendants. | |

**TO:**     Law Offices of Scott A. Lucas
Attorney for Plaintiff
The Lincoln Building - Suite 1001
60 East 42nd Street
New York, New York 10165

**PLEASE TAKE NOTICE** that Defendants in the action in the Supreme Court, State of

New York, have filed a Notice of Removal to the United States District Court for the Southern

District of New York on this 4th day of May 2007, pursuant to 28 U.S.C. § 1441. A copy of such

Notice is attached.

Dated: New York, New York
May 4, 2007

Christina L. Feege (CL-1474)
LITTLER MENDELSON
A Professional Corporation
885 Third Avenue, 16th Floor
New York, New York 10022.4834
Telephone: 212.583.9600
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA ROCKMORE,<br><br>     Plaintiff,<br><br> -against-<br><br>DARRICK E. ANTELL,<br>DARRICK E. ANTELL, M.D., D.D.S., P.C.,<br>DARRICK E. ANTELL, M.D., D.D.S., P.C., F.A.C.S.<br>DARRICK E. ANTELL, M.D., F.A.C.S. and<br>DARRICK E. ANTELL, M.D., F.A.C.S., P.C.,<br><br>     Defendants. | Civil Action No.<br><br><br><br>**CERTIFICATION OF SERVICE**<br>**BY FEDERAL EXPRESS** |

I, **Christina L. Feege** hereby certify that on May 3, 2007, I caused a true and correct copy of Defendants' Notice to State Court of Filing of Notice of Removal, Notice of Removal of Civil Action Under 28 U.S.C. § 1441(b) (Federal Question), and Notice to Adverse Party of Filing of Notice of Removal, to be served *via* Federal Express upon the following:

Scott A. Lucas, Esq.
Law Offices of Scott A. Lucas
Attorney for Plaintiff
The Lincoln Building - Suite 1001
60 East 42nd Street
New York, New York 10165
(212) 573-6906

I declare under penalty of perjury under the laws of the Untied States of America that the forgoing is true and correct.

Executed this 3rd day of May 2007 in New York, New York.

           _____
           Christina L. Feege (CL-1474)

**EXHIBIT 3**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

BARBARA ROCKMORE,

                    Plaintiff,

    -against-

DARRICK E. ANTELL,
DARRICK E. ANTELL, M.D., D.D.S., P.C.,
DARRICK E. ANTELL, M.D., D.D.S., P.C., F.A.C.S.
DARRICK E. ANTELL, M.D., F.A.C.S. and
DARRICK E. ANTELL, M.D., F.A.C.S., P.C.,

                    Defendants.

---

Index No. 06-118789

**NOTICE TO STATE COURT OF
FILING OF NOTICE OF REMOVAL**



NEW YORK
COUNTY CLERK'S OFFICE
MAY - 4 2007
NOT COMPARED
WITH COPY FILE

TO:    **Clerk of Court**
       **Supreme Court of the State of New York**
       **County of New York**
       **60 Centre Street**
       **New York, New York 10007**

        **PLEASE TAKE NOTICE** that on May 4, 2007, Defendants DARRICK E. ANTELL,

DARRICK E. ANTELL, M.D., D.D.S., P.C., DARRICK E. ANTELL, M.D., D.D.S., P.C.,

F.A.C.S. DARRICK E. ANTELL, M.D., F.A.C.S., and DARRICK E. ANTELL, M.D., F.A.C.S.,

P.C., filed a Notice of Removal with the United States District Court for the Southern District of

New York.  A copy of the said Notice of Removal is annexed hereto.

Dated: New York, New York
       May 4, 2007

                                    _____
                                    Christina L. Feege
                                    LITTLER MENDELSON
                                     A Professional Corporation
                                    885 Third Avenue, 16th Floor
                                    New York, NY  10022.4834
                                    Telephone: 212.583.9600
                                    Fax: 212.832.2719


                                    Attorneys for Defendants

## AFFIRMATION OF SERVICE
## BY OVERNIGHT DELIVERY

STATE OF NEW YORK    )
                          : ss:

COUNTY OF NEW YORK  )

**Christina L. Feege** hereby affirms and states under penalty of perjury:

1.     I am admitted to practice law in the courts of the State of New York. I am a resident of the State of New York and am employed in New York, New York. My business address is 885 Third Avenue, 16th Floor, New York, New York 10022. I am over the age of eighteen years and not a party to the above-captioned action.

2.     On May 3, 2007, I caused a true and correct copy of Defendants' Notice to State Court of Filing of Notice of Removal, Notice of Removal of Civil Action Under 28 U.S.C. § 1441(b) (Federal Question), and Notice to Adverse Party of Filing of Notice of Removal, to be served *via* Federal Express upon the following:

Scott A. Lucas, Esq.
Law Offices of Scott A. Lucas
Attorney for Plaintiff
The Lincoln Building - Suite 1001
60 East 42nd Street
New York, New York 10165
(212) 573-6906

3.     I hereby certify that the foregoing statements made by me are true. I understand that if any of the foregoing is willfully false, I am subject to punishment.

Dated: New York, New York
       May 3, 2007

                                       _____
                                       Christian L. Feege

**EXHIBIT 4**

JS 44C/SDNY
REV. 12/2005

## JUDGE BATTS

CIVIL COVER SHEET

**07 CV 3592**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974 is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Barbara Rockmore | Darrick E. Antell, Darrick E. Antell, M.D., D.D.S., P.C., Darrick E. Antell, M.D., D.D.S., P.C., F.A.C.S., Darrick E. Antell, M.D., F.A.C.S. and Darrick E. Antell, M.D., FACS, PC. |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Scott A. Lucas, Esq., 60 East 42nd Street New York, NY 10165, (212) 573-6906 | Christina L. Feege, Esq., Littler Mendelson, P.C. 885 3rd Ave - 16Fl, New York, NY 10022 (212) 583-9600 |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)

EMPLOYMENT DISCRIMINATION 42 U.S.C. SECTION 1981

Has this or a similar case been previously filed in SDNY at any time? No [x] Yes? [ ] Judge Previously Assigned [ ]

If yes, was this case Vol[ ] Invol. [ ] Dismissed. No[ ] Yes [ ] If yes, give date _____ Case No. _____

MAY 0 4 2007

U.S. CASHIERS

(PLACE AN [x] IN ONE BOX ONLY)       NATURE OF SUIT

ACTIONS UNDER STATUTES

### TORTS

**CONTRACT**

[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[ ] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**PERSONAL INJURY**

[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY

**PERSONAL INJURY**

[ ] 362 PERSONAL INJURY - MED MALPRACTICE
[ ] 365 PERSONAL INJURY - PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**

[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**FORFEITURE/PENALTY**

[ ] 610 AGRICULTURE
[ ] 620 FOOD & DRUG
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 630 LIQUOR LAWS
[ ] 640 RR & TRUCK
[ ] 650 AIRLINE REGS
[ ] 660 OCCUPATIONAL SAFETY/HEALTH
[ ] 690 OTHER

**LABOR**

[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
[ ] 740 RAILWAY LABOR ACT
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT

**BANKRUPTCY**

[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**

[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 840 TRADEMARK

**SOCIAL SECURITY**

[ ] 861 HIA (1395FF)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC (405(g))
[ ] 863 DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**

[ ] 870 TAXES
[ ] 871 IRS-THIRD PARTY 26 USC 7609

**OTHER STATUTES**

[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE/ICC RATES/ETC
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 490 CABLE/SATELLITE TV
[ ] 810 SELECTIVE SERVICE
[ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 875 CUSTOMER CHALLENGE 12 USC 3410
[ ] 891 AGRICULTURE ACTS
[ ] 892 ECONOMIC STABILIZATION ACT
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 894 ENERGY ALLOCATION ACT
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES
[ ] 890 OTHER STATUTORY ACTIONS

**REAL PROPERTY**

[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

**CIVIL RIGHTS**

[ ] 441 VOTING
[x] 442 EMPLOYMENT
[ ] 443 HOUSING ACCOMMODATIONS
[ ] 444 WELFARE
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES -OTHER
[ ] 440 OTHER CIVIL RIGHTS

**PRISONER PETITIONS**

[ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION

Check if demanded in complaint:

CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y ? IF SO, STATE

DEMAND $ 3,500,000   OTHER _____   JUDGE _____   DOCKET NUMBER _____

Check YES only if demanded in complaint
JURY DEMAND: [ ] YES [x] NO

NOTE   Please submit at the time of filing an explanation of why cases are deemed related

(SEE REVERSE)

| (PLACE AN x IN ONE BOX ONLY) | ORIGIN | | |
|---|---|---|---|

☐ 1 Original
Proceeding

☒ 2a. Removed from
State Court
☐ 2b. Removed from State Court
AND at least one party is a pro se litigant

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
(Specify District)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate Judge
Judgment

(PLACE AN x IN ONE BOX ONLY)    **BASIS OF JURISDICTION**

☐ 1 U.S. PLAINTIFF    ☐ 2 U.S. DEFENDANT    ☒ 3 FEDERAL QUESTION
(U S NOT A PARTY)    ☐ 4 DIVERSITY

*IF DIVERSITY, INDICATE
CITIZENSHIP BELOW.
(28 USC 1332, 1441)*

### CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF DEF |  | PTF DEF |  | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 [ ] 4 | FOREIGN NATION | [ ] 6 [ ] 6 |

**PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)**

BARBARA ROCKMORE
c/o LAW OFFICES OF SCOTT A. LUCAS
THE LINCOLN BUILDING - SUITE 1001
60 EAST 42ND STREET
NEW YORK, NEW YORK 10165
(212) 573-6906
NEW YORK COUNTY

**DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)**

DARRICK E. ANTELL, DARRICK E. ANTELL, M.D., D.D.S., P.C., DARRICK E. ANTELL, M.D., D.D.S., P.C., F.A.C.S.,
DARRICK E. ANTELL, M.D., F.A.C.S. and DARRICK E. ANTELL, M.D., F.A.C.S., P.C.
850 PARK AVENUE
NEW YORK, NEW YORK 10021
(212) 988-4040
NEW YORK COUNTY

**DEFENDANT(S) ADDRESS UNKNOWN**
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE
RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    ☐ WHITE PLAINS    ☒ FOLEY SQUARE
(DO NOT check either box if this a PRISONER PETITION )

| DATE
APRIL 4, 2007
RECEIPT # | SIGNATURE OF ATTORNEY OF RECORD | ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[x] YES (DATE ADMITTED Mo 10 Yr 94 )
Attorney Bar Code # CL-1474 |
|---|---|---|

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J Michael McMahon, Clerk of Court by _____ Deputy Clerk. DATED _____

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)