Law Offices of Scott A. Lucas
60 East 42nd Street, Suite 1001
New York, New York 10165
(212) 573-6906
Scott A. Lucas, Esq. (SL-6316)
*Attorneys for Plaintiff Barbara Rockmore*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

BARBARA ROCKMORE,                                    07-CV-3592 (DAB)

                              *Plaintiff*,

          -against-                                  **MEMORANDUM OF
                                                     LAW IN OPPOSITION
                                                     TO DEFENDANTS'
DARRICK E. ANTELL,                                   MOTION TO DISMISS**
DARRICK E. ANTELL, M.D., D.D.S., P.C.,
DARRICK E. ANTELL, M.D., D.D.S., P.C., F.A.C.S.,
DARRICK E. ANTELL, M.D., F.A.C.S. and
DARRICK E. ANTELL, M.D., F.A.C.S., P.C.,

                              *Defendants*.
-----------------------------------------------------------------X

      Plaintiff BARBARA ROCKMORE ("Plaintiff"), by her attorneys, the Law

Offices of Scott A. Lucas, respectfully submits this Memorandum of Law in

Opposition to the Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P.

12(b)(6), together with the accompanying Declaration of Scott A. Lucas dated

May 25, 2007 ("Lucas Decl."). As detailed below, Defendants' motion should be

denied.

## BACKGROUND

      This case involves a hostile work environment permeated by virulent anti-

Semitism, misogyny and discriminatory and hate-filled depravity, all of which was

practiced and perpetrated by Darrick E. Antell, the man who owns and controls the

company that employed Plaintiff.  The Complaint (which has since been amended)

asserts claims under the New York City Human Rights Law and 42 U.S.C. § 1981.

*See* Lucas Decl., Ex. "1" (Am. Comp. at ¶¶ 165-181).

The Summons was filed on December 19, 2006 in Supreme Court, New

York County.  The Summons and Complaint were thereafter served on or about

April 11, 2007.

Defendants removed the case to federal court on or about May 4, 2007, and

filed a motion to dismiss on or about May 11, 2007.

The Complaint was amended as of right on May 25, 2007.  *See* Lucas

Decl., Ex. "1".

**ALLEGATIONS OF THE COMPLAINT**
**RELATING TO DEFENDANTS' MOTION**

From December 1993 through July 29, 2004, Plaintiff was employed by

Darrick E. Antell, M.D., D.D.S., P.C., a plastic surgery practice owned and/or

controlled by Darrick E. Antell.  (Am. Comp. at ¶¶ 9-11)

During this time, Dr. Antell subjected Plaintiff, a Jewish female, to an

ongoing course of anti-Semitic, racist and misogynistic behavior, creating a

stressful, hostile working environment.  (Am. Comp. at ¶¶ 21-133)

**Defendants' Agreement**
**to Pay Plaintiff's Legal Fees**

During the latter part of Plaintiff's employment, Defendants became the

target of a federal criminal investigation relating to Dr. Antell's apparent under-

2

reporting and/or diversion of income received by his practice.  This made an already-stressful working environment even more stressful for Plaintiff, especially because she was Defendants' office manager at the time.  (Am. Comp. ¶ 135)

Having been questioned by federal law enforcement agents about Dr. Antell's income and income-related practices, Plaintiff feared that she could face increased risks by continuing to work for Dr. Antell while his business was under federal investigation.   (Am. Comp. ¶ 136)

Seeking to allay Plaintiff's serious concerns and dissuade Plaintiff from making a hasty departure, and to acquire ongoing knowledge about the activity level in the government's criminal investigation of him, Dr. Antell, through his counsel, offered to directly pay for Plaintiff to have her own counsel in connection with the federal investigation.  (Am. Comp. ¶ 137)

The only condition of Defendants' offer to pay Plaintiff's legal fees was that such fees be incurred on behalf of Plaintiff in connection with the federal investigation.  It was not otherwise limited as to duration.   (Am. Comp. ¶ 138)

Plaintiff accepted Defendants' offer, and, in reliance on Defendants' promise, chose to be represented by a prestigious law firm (Arkin Kaplan LLP) experienced in white collar criminal matters.  (Am. Comp. ¶ 139)

**Plaintiff's Vested Pension Benefits**

Besides having the power (but not the right) to cut off payment of Plaintiff's legal fees, Dr. Antell had "leverage" over Plaintiff by virtue of her

longstanding participation in a qualified profit sharing plan that he administered. (Am. Comp. ¶ 140)

While it appears that Dr. Antell systematically under-reported his practice's income and diverted Plan funds to family members serving as phantom employees, Plaintiff's pension still managed to accrue nearly $50,000 in vested benefits. Plaintiff needed this money for her retirement. (Am. Comp. ¶ 140)

**Events Leading Up to
the Termination of Plaintiff's Employment**

During the latter part of Plaintiff's employment, Dr. Antell, who was still angry with Plaintiff for responding truthfully to investigators' questions, began to undermine Plaintiff's authority and informed Plaintiff that she would be replaced as office manager, and effectively demoted to the position of billing manager. (Am. Comp. ¶ 141)

Shortly thereafter Plaintiff accepted an offer to work for a different employer, and, on July 12, 2004, she gave Dr. Antell 2½ weeks notice and informed him that July 29, 2004 would be her last day of employment. (Am. Comp. ¶ 142)

In or about mid-day on Plaintiff's last day of employment (July 29, 2004), an uncharacteristically friendly Dr. Antell informed Plaintiff that she would be receiving a parting bonus of three weeks pay "for all of [her] good work." Plaintiff was not asked to sign a release at that time or at any time before then. (Am. Comp. ¶ 143)

At or about 5:00 p.m. that day, as Plaintiff was preparing to depart the office, Dr. Antell approached her after she picked up her purse and said "*not so fast.*" He then held up a check in one hand and a purported release in the other. (Am. Comp. ¶ 144)

Dr. Antell told Plaintiff that the check was for fees charged by Arkin Kaplan, which Dr. Antell had previously promised to pay. (Am. Comp. ¶ 145)

Looking at the purported release he was holding in his hand, Dr. Antell told Plaintiff "*If you don't sign this form, this check's getting ripped up, your attorney's fees won't get paid, and you won't get your pay, or your pension or anything else.*" (Am. Comp. ¶ 146)

Fearful of having her pension taken away, and of having Defendants breach their agreement to pay Plaintiff's legal fees (which would have left her indebted, and without the means to pay for continued representation), Plaintiff, at Dr. Antell's insistence, filled in the date (7/29/04), a dollar figure ($3,650) and signed her name to the document. (Am. Comp. ¶ 147)

Thereafter, without being asked by Plaintiff to do so, Defendants electronically transferred $3,371 to Plaintiffs' bank account. According to Defendants, the sum represents the amount listed on the "release" (less social security and Medicare withholdings) rather than the parting bonus that Dr. Antell promised Plaintiff earlier that day.[1] (Am. Comp. ¶ 148)

---

[1] Plaintiff notes that the parting bonus that Dr. Antell promised to Plaintiff on July 29, 2004 has no relation to the unspecified payment that Defendants describe on page 9 of their Memorandum

In addition, Plaintiff lacked the resources to file and prosecute a lawsuit against Dr. Antell to receive her pension or to compel the agreed-upon payment of her legal fees.  (Am. Comp. ¶ 149)

New York law does not require a Plaintiff suing for rescission to "tender back" anything (*see* N.Y. Civ. Pract. Laws & Rules, § 3004).  Nonetheless, because the sum that Defendants electronically transferred may arguably constitute the purported consideration identified in the "release," Plaintiff has sought to voluntarily remove any arguable claim of prejudice to Defendants by unconditionally "tendering back" the amount of $3,650, together with a separate check for $727 as interest at the rate of 9%.  (Am. Comp. ¶ 161)

This voluntary "tender back" (made on May 23, 2007) occurred before service of an Answer by Defendants, and before Plaintiff's filing of an Amended Complaint containing a claim for rescission.  (Am. Comp. ¶ 161)  (If, after the case is tried, the Court determines that the "tender back" was unwarranted because the amount that Defendants unilaterally transferred into Plaintiff's bank account may be attributable to the promised parting bonus, then whatever judgment Plaintiff obtains should be adjusted to reimburse Plaintiff for the amount tendered to and accepted by Defendants.)

---

of Law as a "bonus" from the previous pay cycle.  Defendants' reference to an unspecified "bonus" paid during the previous pay cycle (which Dr. Antell would have had to authorize) could refer to one or more of the following:  (a) Plaintiff's "bonus" pay for coming in early, (b) the "bonus" customarily paid for booking a certain number of facelifts in a month, (c) Plaintiff's vacation pay; or (d) Plaintiff's pay for unused personal days.

As detailed below, while the "release" may be void *ab initio*, or ineffective because the sum in question was the previously promised parting bonus, it is also subject to rescission based on the duress caused by Defendants' threat to take away Plaintiff's pension and deprive her of the agreed-upon payment of her legal fees.

## ARGUMENT

## POINT I

### THERE IS NO MERIT TO DEFENDANTS' CONTENTION THAT THE COMPLAINT FAILS TO ALLEGE DURESS

Since a release is a contract, and contracts are governed by state law, the issue of whether the "release" is valid is normally governed by state law.  *Grabe v. Ziff Davis Publishing Co.*, 1995 WL 688912, *9, n.5 (S.D.N.Y. 1995) (cases in which a federal rule of decision should be crafted to displace state law are "few and restricted") (quotation omitted).

Under New York law, allegations that a release was procured by fraud or duress warrant denial of a motion to dismiss grounded on a release.  *See Ladenburg Thallmann & Co. v. Imaging Diagnostic Systems, Inc.*, 176 F.Supp.2d 179, 205 (S.D.N.Y. 2001) (collecting cases); *See also Bloss v. Va'ad Haribonim of Riverdale*, 203 A.D.2d 36, 610 N.Y.S.2d 197, 198 (1st Dept. 1994) ("Where fraud or duress in the procurement of a release is alleged, a motion to dismiss should be denied.") (collecting cases).

While conceding that the facts alleged in the Complaint must be accepted as true on a 12(b)(6) Motion, Defendants contend that the Complaint's allegations of duress are "conclusory" and inadequate as a matter of law. Given the detailed nature of the Complaint and the Amended Complaint, this contention is difficult to take seriously.

Dr. Antell told Plaintiff, as she was preparing to leave the office at the end of the day on her last day of work, "*If you don't sign this form, this check's getting ripped up, your attorney's fees won't get paid, and you won't get your pay, or your pension or anything else.*" *See* Lucas Decl., Ex. "1" (Amended Complaint at ¶ 146).

Unwilling to abide by the rule that the facts of the Complaint must be accepted as true on a 12(b)(6) motion, Defendants seek to portray Dr. Antell's threat to illegally take away Plaintiff's vested pension benefits and deprive her of the agreement-upon payment of her legal fees as "*contractual negotiations*". (Def. Memo. of Law at pg. 3) Defendants' misuse of the 12(b)(6) motion is further evidenced by their attempt to disprove duress through counter-factual assertions that are unsworn and unfounded.

For example, Defendants contend that:

[T]he attorneys' fees that Dr. Antell agreed to cover were paid by check issued *by Plaintiff herself* in her capacity as office manager, dated July 22, 2004, a week *prior* to Plaintiff's execution of the Release. Indeed, the invoice relating to payment of these fees (which are referenced extensively in the complaint) contains the notation, *in Plaintiff's own handwriting*, indicating a payment made on July 22nd.

Def. Memo. of Law at pg. 9 (emphasis in original).

However, rather than supporting Defendants' version of events, the actual check that Defendants present to this Court (Feege Decl., Ex. B) corroborates *Plaintiff's version of events.* An examination of the back of that check reveals that it was not deposited until *August 2, 2004* – 11 days *after* it was printed out, and 4 days *after* Plaintiff's last day of employment. Put simply, while the check was *printed* one week before Plaintiff's final day of work, it was obviously "embargoed" by Dr. Antell (the check's signatory) until *after* Plaintiff signed the purported release on July 29, 2004.

Likewise, Defendants' counsel contends that Plaintiff was merely asked to sign a "standard-issue Release similar to others that [Plaintiff] had executed on behalf of Defendants in connection with other employee departures, so she was fully aware of its terms." (Def. Memo. of Law at pg. 3) To the contrary, of the roughly 25 or so employees who had worked for Defendants during the time she was employed, Plaintiff can only recall one other employee (a woman named "Michelle") who was asked to sign a document that Plaintiff believes was a release.[2] Further, while Plaintiff did see copies of a release in a folder of employment forms during the course of her employment, she denies any knowledge as to whether a release template was kept on her computer, as Defendants allege. (Def. Memo. of Law at pg. 3)

---

[2] If Defendants had tendered an Affidavit from Dr. Antell rather than unsworn and wholly inadmissible statements from his counsel, then Plaintiff would have naturally furnished an affidavit. Moreover, if a hearing is held on this issue, Plaintiff will adduce additional evidence in support of her claim of duress.

In addition, Defendants' counsel simply re-writes the allegations of the Complaint to state that the purported release was given to Plaintiff 16 days before she signed it, *i.e.*, on July 13, 2007 (Def. Memo. of Law at pg. 3), when, in fact, the Complaint clearly states that the purported release was not given to Plaintiff until about 5:00 p.m. on her last day of work, July 29, 2004, as she was preparing to leave.  (Am. Comp. ¶ 144)  On a 12(b)(6) motion there is no occasion for the Court to consider Defendants' counsel's unsworn contentions that the "release" was given to Plaintiff on July 13th, or that Plaintiff was asked to have it reviewed by counsel (which would have been impossible in any event as Plaintiff was required to sign it on the spot, and which would have been immaterial in any event because Dr. Antell was threatening to visit serious economic harm upon Plaintiff if she did not sign the "release").  (Am. Comp. ¶ 148)  *See Bloss v. Va'ad Haribonim of Riverdale*, 203 A.D.2d 36, 610 N.Y.S.2d 197, 200 (1st Dept. 1994) ("[I]t is inequitable to allow a release to bar a claim where, as here, it is alleged that the releasor had little time for investigation or deliberation and that it was the result of overreaching or unfair circumstances.") (citing *Mangini v. McClurg,* 24 N.Y.2d 556, 567, 301 N.Y.S.2d 508, 249 N.E.2d 386 (1969)).

Nor is there any merit to Defendants' contention that this Court should look no further than to the language of the purported release in order to determine whether it was procured by duress.  *See First Nat. Bank of Cincinnati v. Pepper*, 454 F.2d 626 (2d Cir. 1972) ("In our view the district court was required to give consideration to all of the facts relied upon by the stockholders as evidence of

duress rather than rely exclusively upon the terms of the compromise agreement…").

**The Claim that Plaintiff's Free Will Remained Intact**

Having no other alternative, Defendants attempt to liken the egregious facts alleged in the Complaint to the facts in cases involving (A) disputes between business competitors, and (B) discharged employees who signed releases under normal circumstances, but would have preferred better severance packages than they received.

Defendants also assert that Dr. Antell's threat did not preclude Plaintiff's free will because, according to Defendants, many contingency fee lawyers would be eager to take up Plaintiff's cause. (Def. Memo. of Law at pg. 9) However, Defendants' glib assertion is belied by the fact that any lawyer suing Dr. Antell for following through on his threat would be forced (A) to pursue two different actions (one in state and one in federal court), or, at a minimum, (B) to bring a hybrid action consisting of (i) a fact-specific state law claim for breach of an oral contract to pay Plaintiff's legal fees, and (ii) an ERISA claim to recover wrongfully withheld pension monies (a claim that would be even more complicated because, *inter alia*, it would be extremely difficult and expensive to determine exactly how much should be in Plaintiff's pension because it appears that the profits from Defendants' profit sharing plan were grossly under-stated by Dr. Antell's systematic under-reporting of income and diversion of plan funds to family members acting as phantom employees). (Am. Comp. ¶ 151) Coupled

with the prospect having to advance substantial fees for a forensic accountant in such an ERISA action, and the likelihood of a comparatively small recovery in relation to the complexity of the action(s), it is difficult to credit Defendants' hypothesis that many competent, qualified contingency fee lawyers would be eager to take such a case.

The foregoing analysis notwithstanding, we should not make the mistake of imputing a lawyer's knowledge, absorbed and acquired in the calm, quiet environment of the law library, to a layperson, particularly while her back is against the wall and she is being illegally threatened by someone with a track record of unscrupulous behavior and the power to illegally and fatally undermine her financial future.

## POINT II

### THERE IS NO MERIT TO DEFENDANTS' CONTENTION THAT PLAINTIFF "RATIFIED" THE "RELEASE"

Defendants contend that Plaintiff accepted and retained the consideration recited in the "release" ($3,650), and therefore ratified the "release" and is thus precluded as a matter of law from maintaining this action. Defendants' "ratification" argument is flawed, both factually and legally.

**A.**    **The Factual Flaws in Defendants' Argument that Plaintiff Ratified the "Release" by Failing to Promptly Repudiate It**

Defendants' "ratification argument" suffers from the following factual flaws (some of which, in fairness to Defendants' counsel, are more readily apparent in light of the added detail set forth in the Amended Complaint):

(i)    <u>Plaintiff undertook no affirmative act to manifest her purported "acceptance" of the benefit mentioned in the release.</u>  Without any request by Plaintiff, a payment of $3,371 (which did not match the amount mentioned in the release) was electronically transferred to her bank account, and was not accompanied by any information stating whether it represented the parting bonus that Dr. Antell had previously promised Plaintiff for all of her good work (as Plaintiff assumed it to be), or whether it represented purported consideration for the "release". (Am. Comp. ¶ 152)  Moreover, Plaintiff strenuously denies the assertion by Defendants' counsel that the post-it on the "release" which states "only take FICA out" (Feege Decl., Ex. "A") was placed there by Plaintiff, or was written by Plaintiff in connection with the "release"; rather, Plaintiff will testify that it was removed from another document and affixed to the "release," presumably by Dr. Antell.

(ii)    <u>Given Dr. Antell's threat to withhold the agreed upon payment of her legal fees, there is no basis for Defendants' claim that Plaintiff has been free from duress since leaving Defendants' employ</u>:  By threatening to

rip up the check for legal fees already incurred on behalf of Plaintiff and to breach his agreement to continue paying such fees as they come due, Dr. Antell was not only threatening to deprive Plaintiff of the representation he agreed to provide her, he was, in essence, threatening to disrupt a sensitive representation involving ongoing discussions between Plaintiff, her lawyers, and federal officials.  (Am. Comp. ¶ 155) Because she could not afford hire another attorney, much less pay for Arkin Kaplan, Plaintiff would then be forced to go unrepresented in dealing with federal investigators, federal prosecutors, and the federal grand jury.  (Am. Comp. ¶ 156)  Prior to the end of Plaintiff's employment Dr. Antell had proceeded to lay the groundwork to be able to claim (in the context of a later federal criminal prosecution) that his staff was at fault for failing keep records, even though the investigation of him clearly did not occur as a result of his staff's allegedly deficient record-keeping or management skills.  (Am. Comp. ¶ 157)  This fact, coupled with Dr. Antell's previous statements to Plaintiff that his accountants were to blame for the investigation he was facing, caused Plaintiff to be concerned that Dr. Antell might try to blame her as well, particularly if she did not have a lawyer to continue protecting her interests until the criminal investigation of Dr. Antell ended (and it may still be ongoing).  (Am. Comp. ¶ 158)

(iii)   <u>As noted, though she was under no legal obligation to do so under New York law, Plaintiff has unconditionally "tendered back" the sum that Defendants characterize as consideration for the "release," together with interest at 9%</u>.  (*see* CPLR § 3004 and Lucas Decl., Ex. "1" [Am. Comp. ¶ 134, *et seq.*, requesting rescission])

**B.     The Legal Flaws in Defendants' Argument that Plaintiff Ratified the "Release" by Failing to Promptly Repudiate It**

While Defendants rely on cases applying federal common law and the law of other jurisdiction to support their contention that a plaintiff must "tender back" consideration he receives for signing a release, such cases do not apply because the Amended Complaint in this case, which seeks rescission of the release, is governed by New York law, *Grabe v. Ziff Davis Publishing Co.*, *supra*, 1995 WL 688912, *9, n.5 (S.D.N.Y. 1995), and "[i]n New York … the tender back rule was abolished both for procedural <u>and substantive law purposes</u> by enactment of § 112-g of the New York Civil Practice Act.1946 N.Y. Laws ch. 683, re-codified as N.Y. Civ. Prac. L. & R. § 3004 (McKinney 1974)."  *Clark v. Buffalo Wire Works, Inc.*, 3 F.Supp.2d 366, 372 (W.D.N.Y. 1998) (emphasis added; citations omitted).

"In particular, § 3004 provides that a party who received a benefit from a void or voidable transaction need not tender back such benefit before commencing legal action, although 'the court may make a tender of restoration a condition of its judgment, and may otherwise in its judgment so adjust the equities between the

parties that unjust enrichment is avoided.'" *Id.* (citing N.Y. Civ. Prac. L. & R. § 3004 [McKinney 1974]).

In spite of this rule, Plaintiff has unconditionally "tendered back" the sum (with interest) that Defendants unilaterally transferred into Plaintiff's bank account, and which Plaintiff assumed was the parting bonus that Dr. Antell previously promised her, thereby obviating any arguable prejudice to Dr. Antell. This tender back was made prior to the filing of an Answer by Defendants, and prior to Plaintiff's assertion of a claim for rescission (which is present in the Amended Complaint, but was not mentioned in the original Complaint).

CPLR § 3004 is not discussed in the cases cited by Defendants, evidently because: (a) many if not most of those cases were decided under federal common law, which does not apply to this dispute; and (b) most of the plaintiffs in those cases were not suing for rescission, which is necessary for CPLR § 3004 to apply.

Even if New York law required Plaintiff to "tender back" the consideration, if any, that she received for signing the release (which it does not), the "tender back" that Plaintiff has made in this case could not be dismissed as untimely. Drawing heavily on the Restatement (Second) of Contracts, the Second Circuit conducted a scholarly analysis of the factors governing the timeliness of a plaintiff's "tender back" in *Brown v. City of South Burlington, Vermont*, 393 F.3d 337 (2d Cir. 2004), a case governed by the law of a jurisdiction which, unlike New York, *does* require a plaintiff to "tender back" consideration received for signing a release.

In *Brown*, the Second Circuit held that the District Court erred by concluding that a tender back was untimely as a matter of law merely because two years and five months elapsed between the time when the plaintiff learned of the defendant's alleged fraudulent misrepresentations and the time when the plaintiff tendered back the consideration he received in exchange for the release. Before addressing the time factor, the Second Circuit observed that:

> a person "charged with ratification of [a voidable] contract must have acted voluntarily and with full knowledge of the facts." 17A *Am.Jur.2d Contracts* § 11 (2004). Moreover, a party asserting the defense of ratification of a voidable contract ordinarily must demonstrate that the releasor intended to ratify the agreement. *See* M.C. Dransfield, Annotation, *Ratification of Contract Voidable for Duress,* 77 *A.L.R.2d* 426 § 4 (1961) ("While a contract voidable for duress may be ratified, either by express consent, or by conduct inconsistent with any other hypothesis than that of approval, still the intention to ratify is an essential element and is at the foundation of the doctrine of waiver or ratification."); *see also Kovian v. Fulton County Nat'l Bank & Trust Co.,* 857 F.Supp. 1032, 1040 (N.D.N.Y.1994) (holding that the issue of intent to ratify a release was a question of material fact).

393 F.3d at 343-44.

As to the issue of timeliness, the Second Circuit observed that under the Restatement (Second) of Contracts, "the determination of what constitutes a reasonable time is informed by the following factors:

> (a) the extent to which the delay enabled or might have enabled the party with the power of avoidance to speculate at the other party's risk;
>
> (b) the extent to which the delay resulted or might have resulted in justifiable reliance by the other party or by third persons;
>
> (c) the extent to which the ground for avoidance was the result of any fault by either party; and

(d) the extent to which the other party's conduct contributed to the delay.

*Id.* § 381(3). Indeed, the Restatement advises, in light of the foregoing, that "what time is reasonable depends on all the circumstances, including the extent to which the delay was or was likely to be *prejudicial* to the other party or to third persons." *Id.* cmt. a (emphasis supplied).

\*\*\*

According to the general rule, "[w]hether the return was timely is ordinarily a question of fact." *Id.* § 46 & n. 2. Tenders of consideration have been held timely even where they were made after commencement of an action and even at trial on the original claim. *See id.* § 46 & nn. 3-6; *see also* H. Havighurst, *Problems Concerning Settlement Agreements,* 53 Nw. U.L.Rev. 283, 311-13 & n. 100 (1958) (noting that it has been the practice of some courts to allow plaintiffs to tender back consideration for settlement agreements just prior to, or even during, trial; and citing a "substantial number of courts" holding "that, although the release [was] voidable and not void, tender [was] unnecessary").

393 F.3d at 344-45.

Applying these teachings to the case at bar, it is clear that even if New York required plaintiffs to "tender back," Plaintiff's "tender back" in this case would nonetheless be timely under *each* of the above-referenced factors because: (a) the delay did not allow Plaintiff to speculate at Defendants' risk; (b) Defendants did not change their position to their detriment as a result of Plaintiff signing the "release," because the alleged consideration that they paid was returned with interest at 9%; (c) the ground for avoidance resulted solely from the egregious, unlawful and oppressive conduct of Dr. Antell; and (d) the delay was attributable to Defendants' conduct because (i) Plaintiff thought that the sum that Defendants unilaterally transferred into her bank account was the parting bonus that had been previously promised to her, as Defendants failed to identify it as consideration for

18

the "release"; (ii) believing the "release" to be invalid based on the unlawful

manner it was forced on her, Plaintiff was unaware of any alleged need to act

quickly (Am. Comp. ¶ 153), and, to the extent that any such need might be said to

exist generally, Defendants, as wrongdoers, bore the risk that Plaintiff would not

be aware that she even had such a purported obligation; and (iii) the duress was

never removed because Dr. Antell threatened to breach the agreement to cover

Plaintiff's legal fees, and he did so in the middle of an ongoing federal criminal

investigation, at a time when it would untenable for Plaintiff to go unrepresented.

(Am. Comp. ¶ 154)  *See Austin Instrument Inc. v. Loral Corp.*, 292 N.Y.2d 124,

133, 272 N.E.2d 533, 324 N.Y.S.2d 22, 28 (Ct. App. 1971) ("Loral delayed

making its demand for a refund until three days after Austin's last delivery on the

second subcontract. Loral's reason-for waiting until that time-is that it feared

another stoppage of deliveries which would again put it in an untenable situation.

Considering Austin's conduct in the past, this was perfectly reasonable, as the

possibility of an application by Austin of further business compulsion still existed

until all of the parts were delivered.")

　　　　Moreover, given the applicability of CPLR § 3004 to the case at bar,

Defendants' "undue delay" is illogical, a fact clearly illustrated by comparing the

following two patterns:

**Fact Pattern # 1:**

Plaintiff signs a release procured under duress on Jan. 1, 2000, and sues six
months later on July 1, 2000, without tendering back anything to the defendant,
and the case is concluded four years later on July 1, 2004 when the defendant

prevails at trial.  The defendant in this fact pattern must then attempt to collect the release money back four and one-half years later from a plaintiff who may well be insolvent.

**Fact Pattern # 2:**

Plaintiff signs a release procured under duress on Jan. 1, 2000, and unconditionally tenders back the sum he received, plus interest, two years and eight months later on September 1, 2002, at which point he promptly sues defendant.

While the defendant in the second fact pattern is much better off than the defendant in the first fact pattern, the logic advanced by the Defendants in this case would permit the plaintiff in the first action to sue (as he would doubtless be entitled to do under CPLR § 3001), but would *prohibit* the plaintiff in the second fact pattern doing so, even though his conduct (unconditional tender back, with interest) has eliminated the potential prejudice that the defendant in that case would otherwise face.  The law should not embrace such an absurd result.

In addition, since the value of Plaintiff's claims is vastly greater than the $3,650 recited as consideration in the "release," it is clear that Dr. Antell would not have accepted a "tender back" even if it was made by Plaintiff the day after Defendants unilaterally transferred the sum of $3,371 into Plaintiff's bank account.  Conversely, the disparity between the value of Plaintiff's claims and the $3,371 paid by Defendants as purported consideration lends support to Plaintiff's claim that the "release" was not voluntarily and knowingly made.  *Compare Frumkin v. International Business Machines Corp.*, 801 F.Supp. 1029, 1043

(S.D.N.Y. 1992) (the extent of the consideration received by employee, $178,000, bolstered claim that release was "knowing and voluntary").

Finally, given the extreme and egregious nature of Dr. Antell's conduct, and the compelling public interest that he was seeking to prevent from ever being vindicated, the "release" is also void *ab initio* and void as against public policy.

## POINT III

### THE NEW YORK CITY HUMAN RIGHTS LAW APPLIES TO THE FACTS OF THIS CASE

Notwithstanding the unsworn statement that Defendants' medical practice employed fewer than four persons, the allegations of the Complaint must be accepted as true on a 12(b)(6) motion. Moreover, it is settled that the NYCHRL also provides for individual liability. *See Feingold v. New York,* 366 F.3d 138, 158 (2d Cir.2004).

### CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that Defendants' motion be denied.

Dated: New York, New York
May 25, 2007

Law Offices of Scott A. Lucas
The Lincoln Building, Suite 1001
60 East 42nd Street
New York, New York 10165
(212) 573-6906
*Attorneys for Plaintiff*
*Barbara Rockmore*

By_____/s/_____
Scott A. Lucas (SL-6316)